# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHEILA RUSSELL, JIM SPLAIN,
SUE SPLAIN, JANELLE SPLAIN,
SUSAN HOUSEL, JOHN CHAFFEE,
CAROL FRENCH, CLAUDE
ARNOLD, LYNSEY ARNOLD,
CAROLYN KNAPP, N.K., A
MINOR BY CAROLYN KNAPP,
GUARDIAN, M.K., A MINOR BY
CAROLYN KNAPP, GUARDIAN,
and ALLISON KOLESAR,

        Plaintiffs,

    v.

CHESAPEAKE APPALACHIA,
L.L.C.,

        Defendant.

No. 4:14-CV-00148

(Judge Brann)

## MEMORANDUM OPINION

### DECEMBER 27, 2018

Years of litigation have distilled Plaintiffs' multi-count complaint into a single claim for private nuisance against Defendant Chesapeake Appalachia, L.L.C. ("Chesapeake"). Chesapeake now moves for summary judgment, and for the following reasons, Chesapeake's motion will be granted.

# I. BACKGROUND

On December 27, 2013, Plaintiffs filed a five-count complaint in the Court of Common Pleas of Dauphin County, Pennsylvania alleging various nuisance and negligence claims.[1] Plaintiffs contend that Chesapeake's natural gas wells created excessive noise, traffic, dust, light, and air pollution, and have impaired Plaintiffs' water quality.[2] Chesapeake removed the action to the Middle District of Pennsylvania,[3] and over the past five years, this Court has adjudicated pretrial motions, and dismissed certain claims and parties from the suit.[4] Earlier this year, Chesapeake moved for summary judgment.[5]

In that motion for summary judgment, Chesapeake argued in part that Plaintiffs' nuisance and negligence claims were barred by Pennsylvania's two-year

---

[1]    *See* Complaint (ECF No. 1-1) at 5-65.  Although Nabors Completion & Production Services, Co. f/k/a Superior Well Services, Inc. ("Nabors") was originally named as a co-defendant, Nabors was later dismissed under a stipulation of voluntary dismissal.  *See* Stipulation of Voluntary Dismissal (ECF No. 58); Order Approving Stipulation of Dismissal (ECF No. 59).

[2]    *See* Complaint (ECF No. 1-1); Amended Complaint (ECF No. 34).

[3]    *See* Joint Notice of Removal (ECF No. 1).

[4]    Upon adjudicating Chesapeake's motion to dismiss, this Court dismissed the plaintiffs' claims for punitive damages and negligence *per se* without prejudice and with leave to amend, dismissed plaintiffs' negligence *per se* claim to the extent it was based on the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.*101 et seq.*, with prejudice, and compelled four plaintiffs to arbitration.  *See* Motion to Dismiss (ECF NO. 4); Order (ECF No. 33). The thirteen remaining plaintiffs—Sheila Russell, Jim Splain, Sue Splain, Janelle Splain, Susan Housel, John Chaffee, Carol French, Claude Arnold, Lynsey Arnold, Carolyn Knapp, N.K., M.K., and Allison Kolesar—filed an amended complaint.  *See* Amended Complaint (ECF No. 34).

[5]    *See* Chesapeake's Motion for Summary Judgment (ECF No. 66).

statute of limitations.[6]  Plaintiffs subsequently withdrew their negligence claims.[7] As a result, the only claim now pending before this Court is Plaintiffs' action for private nuisance.

To facilitate resolution of Chesapeake's motion for summary judgment, this Court ordered parties to submit supplemental briefing discussing whether Plaintiffs' nuisance claims were barred by Pennsylvania's two-year statute of limitations.[8]  Specifically, this Court asked for argument as to whether, for limitations purposes, Chesapeake's actions constitute a permanent or a continuing nuisance; whether the discovery rule, if it applies at all, tolls the limitations period; and whether Plaintiffs' claims should be severed prior to trial.  Both parties submitted the requisite supplemental briefing, and the issues are now ripe for disposition.[9]

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[6]    *See* Defendant's Brief in Support (ECF No. 68).

[7]    *See* Plaintiff's Brief in Opposition (ECF No. 71).

[8]    *See* Order (ECF No. 75).

[9]    *See* Plaintiffs' Supplemental Brief (ECF No. 80); Defendant's Supplemental Brief (ECF No. 81); Plaintiff's Reply Brief (ECF No. 83); Defendant's Reply Brief (ECF No. 82).

matter of law."[10]   A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[11]   To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[12]   When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[13]

### B. Whether Plaintiffs' Nuisance Claims Are Barred by Pennsylvania's Two-Year Statute of Limitations

Under Pennsylvania law,[14] a defendant is liable for private nuisance by intentionally and unreasonably invading another's use and enjoyment of his or her land.[15]   Nuisance actions are subject to a two-year limitations period.[16]

---

[10]   Fed. R. Civ. P. 56(a).

[11]   *Lichtenstein v. Univ. of Pittsburgh Medical Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).

[12]   Fed. R. Civ. P. 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[13]   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[14]   When adjudicating a state law claim pursuant to its diversity jurisdiction, a federal court applies the substantive law of the forum state—here, Pennsylvania. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Kaplan v. Exxon Corp.*, 126 F.3d 221, 224 (3d Cir. 1997). Statutes of limitation are characterized as substantive law. *Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 487 (3d Cir. 1985). Accordingly, this Court's analysis proceeds under Pennsylvania law.

[15]   *Tiongco v. Southwestern Energy Production Co.*, 214 F.Supp.3d 279, 284 (2016) (citing *Karpiak v. Russo*, 676 A.2d 270, 272 (Pa. Super. 1996)). A defendant can also incur nuisance liability if the invasion is "unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." *Id.* But when a plaintiff pleads a negligence claim in conjunction with a nuisance claim, and later withdraws the nuisance claim, a plaintiff admits that he or she is no longer pursuing a nuisance claim based on unintentional or negligent conduct. *Id.* at 290.

Determining when a plaintiff's nuisance claim accrued depends on whether the alleged invasion constitutes a permanent or continuing nuisance.[17] A permanent nuisance claim accrues at the time the plaintiff was first injured.[18] A continuing nuisance claim accrues anew upon each new injury.[19] As I explain below, to the extent Chesapeake's operations constitute a nuisance, that nuisance is permanent.

---

Here, because Plaintiffs withdrew their negligence claims, *see* Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 71) at 10, and never alleged that defendants engaged in abnormally dangerous conduct, their only "live claim" for nuisance is based on intentional conduct. *See Tioncgo*, 214 F.Supp.3d at 290 (concluding that because plaintiff withdrew negligence claim and never alleged abnormally dangerous conduct claim, nuisance claim was based on intentional conduct).

[16] *See Cassel-Hess v. Hoffer*, 44 A.3d 80, 88 (Pa. Super. 2012) (citing 42 Pa.C.S.A. § 5524(7)); *accord Dombrowski v. Gould Electronics, Inc*., 954 F.Supp. 1006, 1013 (M.D.Pa. 1996).

[17] *See Sustrik v. Jones & Laughlin Steel Corp.*, 197 A.2d 44, 46–47 (Pa. 1964).

[18] *See, e.g.*, *Cassel-Hess*, 44 A.3d at 88 (citing *Cass v. Penna. Co.,* 159 Pa. 273, 28 A. 161, 163 (1893)); *Dombrowski*, 954 F.Supp. at 1009 (holding lead processing plant's seepage of lead and subsequent air, groundwater, and soil contamination constituted a permanent trespass); *Warminster Township Municipal Authority v. United States*, 903 F.Supp. 847, 849, 851 (E.D.Pa. 1995) (hazardous substances escaping from the Naval Air Warfare Center that contaminated municipal water wells constituted permanent injury); *Tri-County Business Campus Joint Venture v. Clow Corp.*, 792 F.Supp. 984, 996 (E.D.Pa. 1992) (finding "depositing of the waste was a completed act at the time that the property was conveyed" and constituted a permanent injury).

[19] *See, e.g.*, *Miller v. Stroud Tp*, 804 A.2d 749, 754 (Pa. Commw. 2002) (concluding plaintiffs alleged continuing trespass claim by claiming that defendant's construction of sewer pipeline coupled with effects of rainfall resulted in "continuing trespass of water and fecal matter, which caused damages to [plaintiff's] property"); *Graybill v. Providence Twp.,* 593 A.2d 1314, 1316 (Pa. Commw. 1991) (finding defendant's three-house development coupled with rainfall constituted continuing trespass); *Jones v. Wagner*, 624 A.2d 166, 170 (Pa. Super. 1993) (finding overhanging tree branches are a continuing trespass "given the rather unremarkable observation that trees will tend to grow, the trespass, even if remedied once, is bound to recur just as soon as the trees or shrubbery regenerate").

Consequently, Plaintiffs' claims are time-barred because Plaintiffs filed suit more than two years after they were first injured.

### 1. Plaintiffs' allege a permanent nuisance claim.

Pennsylvania courts use a multi-factor inquiry to determine whether an alleged nuisance is permanent or continuing.[20]  To begin, a court must decide whether the action concerns "a permanent change in the condition of the land" or whether the action "alleges separate, independent injuries."[21]  In answering that question, courts interpreting Pennsylvania law have considered "(1) the character of the structure or thing which produces the injury; (2) whether the consequences of the nuisance will continue indefinitely, and (3) whether past and future damages may be predictably ascertained."[22]

Pennsylvania courts in two cases—*Cassel-Hess v. Hoffer* and *Graybill v. Providence Township*—illustrate how these factors help differentiate between permanent and continuing nuisance claims.  In *Cassel-Hess v. Hoffer*, the Superior Court of Pennsylvania concluded that a mosquito-infested lake was a permanent nuisance.  There, plaintiffs sued their neighbor for trespass and nuisance after the neighbor constructed a commercial office building that caused standing flood

---

[20]  Although Plaintiffs style their claim as one for "temporary nuisance," *see e.g.* Brief in Opposition (ECF No. 71) at 6, Pennsylvania courts distinguish between permanent nuisances, on the one hand, and continuing nuisances, on the other.

[21]  *See, e.g., Cassel-Hess*, 44 A.3d at 87; *Tri-County Business Campus*, 792 F.Supp. at 996.

[22]  *Cassel-Hess*, 44 A.3d at 87 (citing *Sustrik*, 197 A.2d at 46–47 and *Graybill*, 593 A.2d at 1316–1317) (internal quotation marks omitted).

water to gradually accumulate on his property.[23]   The court applied the three-factor test and reasoned that (1) the character of the structure that produced injury—the lake—was a permanent feature of the neighbor's land; (2) the consequences of the nuisance—standing water and mosquitos—have been "unremitting and will continue indefinitely"; and (3) at the time the lake was formed, the plaintiff's past and future damages stemming from the lake could be predictably ascertained.[24]

Conversely, in *Graybill v. Providence Township*, the Commonwealth Court of Pennsylvania concluded that intermittent and recurring flooding constituted a continuing invasion.  There, the neighbors of the plaintiff subdivided and built three houses on their property.[25]   The plaintiff alleged that the neighbors' development caused increased runoff and drainage that occasionally flooded the plaintiff's land.[26]   In concluding that the flooding constituted a continuing invasion, the court reasoned that (1) the character of the nuisance-producing-thing was a combination of the neighbor's acts (building the subdivision) coupled with occasional rainfall causing "consequential" damage to the plaintiff;[27] (2) the consequences of the injury would not continue indefinitely because the plaintiff

---

[23]   *Cassel-Hess*, 44 A.3d at 81-83.

[24]   *Id.* at 87-88 (citing *Sustrik,* 197 A.2d at 46–47 and *Graybill,* 593 A.2d at 1316–1317).

[25]   *Graybill*, 593 A.2d at 1315.

[26]   *Id.* at 1316.

[27]   *Id.*

didn't suffer flooding after every rain, alleging fewer than ten flooding incidents over a four-year period,[28] and (3) future damages could not be predictably ascertained because, absent pure speculation, it would be impossible to calculate how many times the plaintiff's property may flood in the future and the severity of each flood.[29]

Upon this backdrop, I turn to the matter at hand and conclude that, to the extent Chesapeake's operations constitute a nuisance, that nuisance is permanent.

Under the first factor, I examine the character of the structure or thing that produced Plaintiffs' injuries. Here, it undisputed that Plaintiffs' injuries can be traced to either the natural gas wells themselves or Chesapeake's operations arising from its lawful drilling at those wells.[30] When Chesapeake's physical wells were constructed, they became permanent features of the land.[31] The Pennsylvania Supreme Court has stated that "[i]f the injury is caused by erecting a structure or

---

[28] *Id.* at 1317.

[29] *Id.* at 1317-18.

[30] *See, e.g.*, Plaintiffs' Supplemental Brief (ECF No. 81) at 15 (describing Chesapeake's well pads as "permanent"); *id.* at 21 ("Suffice it to say that Plaintiffs have all experienced similar disruption of their ability to use and enjoy their properties as a result of Defendant's gas wells"); id. at 5-10 (describing the nuisance as stemming from Chesapeake's operations, including traffic, dust, noise, lights, water well contamination); Defendant's Supplemental Brief (ECF No. 80) at 9 (concurring that Plaintiffs' claims stem from "Chesapeake's construction, drilling and completion activities at various natural gas wells").

[31] *Gray v. Citizens' Gas Co. of Port Allegheny*, 212 Pa. 473, 473-75 (1905) (describing natural gas wells as permanent improvements); *Dombroski v. Gould Electronics, Inc.*, 954 F.Supp. 1006, 1012 (M.D.Pa. 1996) (quoting Restatement (Second) of Torts, § 162 cmt. E (1965)) (describing that when a defendant "digs a well" without permission, the defendant causes a permanent injury to the land).

making use of land which the defendant has a right to continue, the injury is regarded as committed once for all, and action must be brought to recover the entire damage, past and future."[32]    There is no evidence suggesting that Chesapeake does not have a right to lawfully engage in it its extraction activities. Accordingly, the character of the structure or thing that produced Plaintiffs' injuries spells permanence.

Under the second factor, I examine whether the consequences of the nuisance—i.e. Plaintiffs' injuries—will continue indefinitely.  Plaintiffs' alleged injuries can be approximated into three categories, and each category supports the notion that Plaintiffs' injuries are permanent.   First, Plaintiffs allege harms emanating from the wells themselves—i.e., noise created by well venting.  When a nuisance producing structure is permanent, like a lake or a street, courts have deemed harms tied to the structure, like a mosquito infestation arising from the lake[33] or damages caused by lowering the grade of a street,[34] to be permanent injuries.   Second, Plaintiffs allege harms that arise as a necessary corollary to Chesapeake's lawful natural gas extraction operation—i.e., traffic to and from the wells, increased noise and dust from that traffic, bright lights erected on the well

---

[32]    *Shaffer v. Pennsylvania Co.*, 109 A. 284, 286 (Pa. 1920).

[33]    *See Cassel-Hess v. Hoffer*, 44 A.3d 80, 86 (Pa. Super. 2012) (explaining that at time of formation, mosquito-infested lake constituted a permanent change in the land).

[34]    *See Ickes v. Borough of Leetsdale*, 93 A. 498, 499 (Pa. 1915) (explaining that when municipality lawfully changed the grade of the street and negatively impacted plaintiff's land, she had but one action to recover for her damages).

pad, and noise from equipment used at the wells to facilitate extraction activities. Injuries associated with a lawful business' ongoing operations, such as a tractor-trailer parking lot's "vibration and noise,"[35] garbage dump's noxious odors[36] and mine refuse dump's foul-smelling gasses[37] have been categorized by Pennsylvania courts as permanent injuries.[38] This conclusion squares with what litigants have conceded in at least one other jurisdiction in that odors and noise produced by natural gas compressor stations are permanent invasions.[39] There is no evidence in the record suggesting that Chesapeake has plans to halt its lawful natural gas extraction business.[40]

---

[35] *See Firth v. Scherzberg*, 77 A.2d 443, 446-48 (Pa. 1951) (explaining that plaintiffs were "permanently impaired" by the "coupling and uncoupling of tractors and trailers, the noise caused by the warming up of the large tractor motors, their acceleration, charging of tractor batteries, sounds of escaping air from the coupling and uncoupling of air brakes and their application, the shifting of gears, the switching of trailers, and muffler explosions and vibrations create great and disturbing noises").

[36] *See Milan v. City of Bethlehem*, 94 A.2d 774, 778 (Pa. 1953) ("It cannot be said, as a matter of law, that the garbage dump in the instant case is transient and temporary. The prospect is that it will be continued into the indefinite future for the uses of the defendant municipality, and that spells permanency.").

[37] *See Evans v. Moffat*, 160 A.2d 465, 470 (Pa. Super. 1960) (upholding lower court's finding that air pollution from coal mine refuse dump constituted permanent injury).

[38] *See Shaffer v. Pennsylvania Co.*, 109 A. 284, 286 (Pa. 1920) ("If the injury is caused by erecting a structure or making use of land which the defendant has a right to continue, the injury is regarded as committed once for all, and action must be brought to recover the entire damage, past and future.").

[39] *See Town of Dish v. Atmos Energy Corporation*, 519 S.W.3d 605, 609 n.4 (Tex. 2017) ("In this case it is undisputed that the nuisance alleged by the residents is permanent rather than temporary.").

[40] *See Schlichtkrull v. Mellon-Pollock Oil Co.*, 152 A. 829, 831 (Pa. 1930) (explaining that harm caused by lawful business is permanent "where the reasonable supposition is that it will be carried on."). Even if Chesapeake has ceased operations at certain wells, courts have

Third, Plaintiffs allege harms that, although they may arise from Chesapeake's operations, they are harms that are not necessary to its extraction activities—i.e., water contamination and gas migration. Pennsylvania courts have held analogous emissions to be permanent invasions. These permanent invasions include a lead processing plant's seepage,[41] a munitions facility's water-contaminating emissions,[42] the dumping of hazardous waste,[43] an oil well's failure to prevent comingling of salt and freshwater[44] and a coal mine's destruction of a local spring.[45]

Plaintiffs seem to contest the permanency of Chesapeake's operations or the permanency of their injuries by arguing that since their harms occur unpredictably, unpredictable harms do not amount to a permanent change in the condition of

deemed permanent certain injuries outlasting the injury-causing-operation. *See Warminster Township Municipal Authority v. United States*, 903 F.Supp. 847 (E.D.Pa. 1995); *Dombroski v. Gould Electronics, Inc*., 954 F.Supp. 1006 (M.D.Pa. 1996).

[41] *See Dombrowski,* 954 F.Supp. at 1009 (holding lead processing plant's seepage of lead and subsequent air, groundwater, and soil contamination constituted a permanent trespass).

[42] *See Warminster Township Municipal Authority*, 903 F.Supp. at 849, 851 (hazardous substances escaping from the Naval Air Warfare Center that contaminated municipal water wells constituted permanent injury).

[43] *See Tri-County Business Campus Joint Venture v. Clow Corp*., 792 F.Supp. 984, 996 (E.D.Pa. 1992) (finding "depositing of the waste was a completed act at the time that the property was conveyed" and constituted a permanent injury).

[44] *See Schlichtkrull,* 152 A. at 829-31 (concluding that infusion of salt water into plaintiff's wells due to defendant's oil drilling activities was deemed to be permanent injury).

[45] *See Hoffman v. Berwind-White Coal Mining Company,* 109 A. 234 (Pa. 1920) (explaining that destruction of plaintiffs' springs as the result of defendant's coal mining activities constituted permanent injury).

either Chesapeake's land or the Plaintiffs' land.[46]  To support this proposition,

Plaintiffs cite to *Graybill*—the case where flooding constituted a temporary

invasion because of its intermittent and unpredictable nature.  But *Graybill* is

inapposite. In *Graybill*, the court concluded that the defendant's acts (building the

subdivision on his own land) coupled with an intervening natural force (rainfall)

caused "consequential" and intermittent damage to the plaintiff.  That is, it was not

the neighbor's act alone in building the subdivision that caused the plaintiff's

harm.[47]  Here, Plaintiffs do not allege that any intervening natural force comingles

with Chesapeake's operations to cause a tortious invasion.  Although Plaintiffs

may not know the precise moment that a truck will rumble, dust will accumulate, a

---

[46]  Response to Defendant's Motion for Summary Judgment (ECF No. 71) at 6-7.  Plaintiffs cite to *Graybill v. Providence Township* and, without explanation, appear to suggest that because the Plaintiffs' injuries are "intermittent or temporary and do not result in a permanent change in the condition of the plaintiff's land," plaintiffs may recover under a temporary nuisance theory "irrespective of the permanence of defendant's structure on his land."  In their supplemental brief on this issue, Plaintiffs again point to *Graybill*, without explanation as to its application.  *See* Plaintiff's Supplemental Brief (ECF No. 81) at 14.  As discussed *supra*, *Graybill* is distinguishable from this case.

Plaintiffs also cite to *Lake v. Hankin Group*., 79 A.3d 749 (Pa. Commw. 2013) to ostensibly support their notion that Chesapeake's allegedly tortious conduct resembles that of intermittent flooding.  In *Lake*, the court found that the defendant's development coupled with "effects of rainfall" constituted a continuing trespass when water and sediment caused damage to plaintiff's property.  *Lake, Graybill*, and other flooding cases make clear that when a defendant's actions coupled with another intervening natural force cause harm, those circumstances allow for harms to be construed as intermittent.  Again, those circumstances are not present here.  *See also Burke v. Hemlock Farms Community Ass'n*, 3:CV–07–1186, 2009 WL 3601592, *4 (M.D.Pa. Oct. 28, 2009) (finding question of fact existed as to whether storm water culvert coupled with effects of rainfall resulted in intermittent harm).

[47]  *Graybill*, 593 A.2d at 1316; *see also Miller v. Stroud Township*, 804 A.2d 749 (Pa. Commw. 2002) (finding defendant's construction of sewer line coupled with "effects of rainfall" constituted a continuing trespass when water and fecal matter caused damage to plaintiff's property).

well will vent, or a bright light will flash, these injuries are predictable within the gamut of Chesapeake's lawful energy extraction operations.

Similarly unavailing is Plaintiffs' attempt to characterize these so-called unpredictable injuries as temporary. The level of traffic congestion, the amount of dust, the volume of noise, and brightness of lights may fluctuate in relation to Chesapeake's operations. In other words, Plaintiffs may enjoy some disturbance-free days, while on others may endure the roars of a venting well. The fact that these harms may change day-to-day does not obscure the reality that they remain tied to Chesapeake's lawful energy extraction operation, and "where the continuance of a lawful business causes the harm, the injury will be considered permanent and it will be treated as such where the reasonable supposition is that it will be carried on."[48] By analogy, in *Cassell-Hess*, the mosquito-infested lake case, the court categorized standing water and mosquitos as "unremitting" and to continue indefinitely even though mosquitos are obviously not aflutter in the winter.[49] Here, therefore, the consequences of the nuisance will continue indefinitely.

Turning to the third factor, I consider whether Plaintiffs' past and future damages may be predictably ascertained. Plaintiffs assert that the amount of past

---

[48] *Schlichtkrull v. Mellon-Pollock Oil Co.*, 152 A. 829, 831 (Pa. 1930).

[49] *See Cassel-Hess v. Hoffer*, 44 A.3d 80, 82-83, 87-88 (Pa. Super. 2012).

damages is "impossible to calculate" because a jury, not the court, makes that determination.[50]  While Plaintiffs are correct that damage calculations fall to the jury,[51] that truism sidesteps the question as to whether the amount of either past and future damages may be ascertained in a single action, or whether assessing damages becomes a speculative endeavor.  Indeed, the ascertainability of Plaintiffs' past damages in a single action cannot be seriously controverted so long as Plaintiffs set forth a reasonable basis to calculate their damages, regardless of whether their injuries are deemed permanent or temporary.[52]

Turning to the ascertainability of future damages, two cases—*Graybill v. Providence Township* and *Schneider National Carriers, Inc. v. Bates*—are instructive.  *Graybill*, the intermittent flooding case, illustrates the type of future damages unascertainable in a single action.  There, one particular flooding incident

---

[50]   *See* Plaintiffs' Supplemental Brief (ECF No. 81) at 10-11 ("The value of Plaintiffs' past damages is a question for the jury to decide–they must determine what they feel, based upon the testimony and evidence placed before them, what the Plaintiffs' loss of their lifestyle along with the loss of the use and enjoyment of their property is worth. It is impossible to calculate the amount of the past damages.").

[51]   *See, e.g.*, *Tonik v. Apex Garages, Inc.*, 275 A.2d 296, 299 (Pa. 1971).

[52]   *See Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1030 (Pa. 1980) (The "law does not require that proof in support of claims for damages or in support of compensation must conform to the standard of mathematical exactness.  All that the law requires is that (a) claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough."); *Milan v. City of Bethlehem*, 94 A.2d 774, 779 (Pa. 1953) (explaining in a nuisance action, damages would include "loss of use and enjoyment if the injury was temporary or for the diminished value of their property if the injury was permanent"); *Evans v. Moffat*, 160 A.2d 465, 466 (Pa. Super. 1960) (affirming trial court's finding that damage to plaintiffs was permanent, that the correct method to calculate damages was the difference in property value before the invasion versus after the invasion, and affirming an award of personal damages for annoyance and discomfort).

required the plaintiff to replace his home appliances.[53]  The court explained that to force the plaintiff in a single action to allege the total number of replacement appliances he would ever need in light of intermittent and unpredictable flooding would be purely speculative.[54]  Thus, the court concluded that while past damages in that action were ascertainable (the appliances lost in that particular flood) damages for future injury were not (the appliances that may be lost in future floods).[55]

Without any Pennsylvania authority on point, I find persuasive *Schneider National Carriers, Inc. v. Bates*, a case in which the Texas Supreme Court explained when future damages are ascertainable in a single action for nuisance. The *Bates* court held:

> [I]f a nuisance occurs several times in the years leading up to a trial and is likely to continue, jurors will generally have enough evidence of frequency and duration to reasonably evaluate its impact on neighboring property values.  In such cases, the nuisance should be treated as permanent, even if the exact dates, frequency, or extent of future damage remain unknown. Conversely, a nuisance as to which any future impact remains speculative at the time of trial must be deemed "temporary….Accordingly, we hold that a nuisance should be deemed temporary only if it is so irregular or intermittent over the period leading up to filing and trial that future injury cannot be estimated with reasonable certainty. Conversely, a nuisance should be deemed permanent if it is sufficiently constant or regular (no matter

---

[53]  *Graybill v. Providence Twp.*, 593 A.2d 1314, 1317-18 (Pa. Commw. 1991).

[54]  *Id.*

[55]  *Id.*

how long between occurrences) that future impact can be reasonably evaluated"[56]

Here, Plaintiffs state that they do not seek to recover for future harms, arguing that they do not believe "future damages are recoverable in an action for a continuing and temporary nuisance claim."[57]   But the disturbances of which Plaintiffs complain have occurred with sufficient regularity such that their future impact could have been reasonably evaluated by a jury in a single action.[58]   The disturbances are not so irregular or unpredictable, akin to the unknown consequences of intermittent flooding, such that they cannot be estimated in a single action absent unadulterated speculation.   Accordingly, Plaintiffs' past and future damages may be predictably ascertained.

---

[56]   *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 280-81 (Tex. 2004).

[57]   Plaintiffs' Supplemental Brief (ECF No. 81) at 14-15.

[58]   *Schneider*, 147 S.W.3d at 281; *Graybill v. Providence Twp.,* 593 A.2d 1314, 1317-18 (Pa. Commw. 1991).  *See also Delahanty v. First Pennsylvania Bank, N.A.*. 464 A.2d 1243, 1257-58 (Pa. Super. 1983) ("The standard in Pennsylvania civil cases for determining future damages is that the plaintiff bears the burden of proof by a 'preponderance of the evidence.'  Under this criterion, the plaintiff is required to furnish only a reasonable quantity of information from which the fact-finder may fairly estimate the amount of damages. Though justice and public policy require that the wrongdoer bear the risk of uncertainty which his own wrong has created and which prevents the precise computation of damages, the fact-finder still may not render a verdict based on speculation or guesswork. Yet, the fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable and inferential, as well as upon direct and positive proof. Thus, the law does not demand that the estimation of damages be completely free of all elements of speculation") (internal quotation marks and citations omitted).

In sum, Plaintiffs, as a matter of law, have alleged a claim for permanent nuisance.[59] First, it is an unremarkable conclusion that Chesapeake's energy extraction operations concern a permanent change in the condition of the land because Chesapeake's wells and the accompanying operation evince permanence. Second, whether looking to harms emanating from the wells themselves, harms arising as a corollary to Chesapeake's operations, or harms that do not, the consequences of the nuisance will continue indefinitely, or at a minimum, will continue while Chesapeake maintains its operations in the area.[60] Indeed, Plaintiffs make individualized allegations that they experienced harms that were "ongoing," "reoccurring," "significant and frequent."[61] Third, and most convincingly, Plaintiffs' past and future damages stemming from Chesapeake's wells and the

---

[59] I conclude that Plaintiffs have alleged a permanent nuisance claim for limitations purposes without deciding whether Chesapeake's actions constitute a nuisance as a matter of law or a nuisance per se. *See Nesbit v. Riesenman*, 298 Pa. 475, 148 A. 695, 697 (1930) (explaining that a nuisance per se "is an act which is a nuisance at all times and at all places").

[60] *Schlichtkrull v. Mellon-Pollock Oil Co.*, 152 A. 829, 831 (Pa. 1930) ("where the continuance of a lawful business causes the harm, the injury will be considered permanent and it will be treated as such where the reasonable supposition is that it will be carried on").

[61] *See, e.g.*, Plaintiffs' Supplemental Brief (ECF No. 81) at 5 (explaining that Plaintiffs have suffered from truck traffic, dust, noise, and lights which "has been going on from 2011 through the time of the Plaintiffs depositions in 2017"); *Id.* at 7 (complaining of "on-going, intermittent contamination of well water"); *Id.* at 8 (describing nuisance as "on-going"); Plaintiffs' Reply to Defendant's Supplemental Brief (ECF No. 83) at 2 ("…Rexford Well No. 1 has had ongoing problems well after the drilling of the well…"); Housel, Chaffee Response to First Set of Interrogatories (ECF No. 67-19) at 7 (stating they "have experienced the nuisances on an ongoing and reoccurring basis"); French, C. Arnold, L. Arnold Response to First Set of Interrogatories (ECF No. 67-16) at 12 (characterizing Chesapeake's conduct as "significant and frequent"); Splain Response to First Set of Interrogatories (ECF No. 67-5) at 6 (stating that Jim and Sue Splain "spend most weekends away from the property to escape the nuisance. While they are on the property, they keep windows and doors closed to avoid noise and odors").

accompanying operation could be predictably ascertained in a single action. Although the Plaintiffs' deposition testimony contains differences as to how frequently Chesapeake's operations interfered with their use and enjoyment of property, none allege conditions that were so sporadic or unpredictable that a jury would have to guess their effect. Accordingly, those differences create no genuine dispute of material fact as to whether the nuisances here were permanent.

### 2. Plaintiffs' claims accrued outside of the two-year limitations period.

The Pennsylvania Supreme Court has explained that a plaintiff "is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period."[62] The statutory period for nuisance claims is two years.[63]

Having determined that Plaintiffs allege a permanent nuisance claim against Chesapeake, Plaintiffs consequently have only one action to recover for their alleged harms.[64] I now turn to when Plaintiffs' cause of action accrued.

A nuisance claim accrues when facts exist that authorize the plaintiff "to institute and maintain a suit"—that is, the limitations period begins to run when the

---

[62] *Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)

[63] *Sustrik v. Jones & Laughlin Steel Corp.*, 197 A.2d 44, 46–47 (Pa. 1964); *Cassel-Hess v. Hoffer*, 44 A.3d 80, 88 (Pa. Super. 2012) (citing 42 Pa.C.S.A. § 5524(7)) (explaining statute of limitations for nuisance actions is two years).

[64] *Sustrik*, 197 A.2d at 44.

plaintiff's injury first occurs.[65]  The accrual date may be established as a matter of law.[66]  Here, Plaintiffs filed the present action on December 27, 2013, and for their nuisance claim to be timely, the claim must have accrued no earlier than December 27, 2011.  As explained below, Plaintiffs claims accrued before December 27, 2011, and accordingly, Plaintiffs claims are untimely.

First, Plaintiffs were aware of facts giving rise to their nuisance claim before December 27, 2011.  Plaintiffs uniformly[67] admit that they first experienced harm by Chesapeake's operation when various wells were drilled between 2009 and 2011:[68]

---

[65]  *Pocono Intern. Raceway, Inc.*, 468 A.2d at 471.  *See also Sustrik*, 197 A.2d at 46-47 ("If a nuisance at the time of creation is a permanent one, the consequences of which in the normal course of things will continue indefinitely, there can be but a single action therefor to recover past and future damages and the statute of limitations runs against such cause of action from the time it first occurred, or at least from the date it should reasonably have been discovered."); *Dombrowski v. Gould Electronics, Inc.*, 954 F.Supp. 1006, 1009 (M.D.Pa. 1996) ("It is plain and clear that the two year statute of limitation does not begin to run until the plaintiff, within a reasonable degree of certainty, knows that he has been injured and that said injury has been caused by another party's conduct."); *Cassel-Hess*, 44 A.3d at 87-88 (citing *Cass v. Penna. Co.*, 28 A. 161, 163 (Pa. 1893)) (explaining cause of action for permanent nuisance accrued at time of creation).

[66]  *See Crouse v. Cyclops Industries*, 745 A.2d 606, 611 (Pa. 2000) ("Whether a complaint is timely filed within the limitations period is a matter of law for the court to determine.").

[67]  N.K., M.K., and Lynsey Arnold were not deposed and there is otherwise no evidence in the record showing that they suffered any appreciable interference with the use and enjoyment of the land.  Accordingly, their claims fail.  *See Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir. 1994) (explaining that to survive summary judgment a plaintiff must "make a showing sufficient to establish the existence of every element essential to its case").  Plaintiffs otherwise adduce no evidence or argument as to why N.K., M.K., and Lynsey Arnold's claims should remain.

[68]  *See Merry v. Westinghouse Elec. Corp.*, 684 F.Supp. 852, 854 (M.D.Pa. 1988) ("The injury is done when the act heralding a possible tort inflicts a damage which is physically objective

- **Sheila Russell** explains that when Chesapeake installed bright lights on the well for a period of brief use in 2010, she was forced to move her bedroom to another part of the house.[69] She also states that in early 2011, the well would emit loud, frightening noise as it would vent.[70] She said the noise, which sounded like a jet engine landing, startled her the first time she heard it, causing her to "run out of [the] house and hit the deck."[71] She explains that traffic became worse in 2010-2011.[72] She explains that since 2010, she has not drunk the water and uses three-gallon jugs for cooking and drinking.[73]

- **Jim Splain** states that in 2010, he heard loud noises that impaired his sleeping and thinking.[74] He states that he purchased "extra thick roller shades" to keep lights out of their home, but because of the drilling operations, light found its way in.[75]

- **Sue Splain** states that in 2010, she experienced truck traffic, dust, and light pollution.[76] During that time, she kept her windows closed to block out noises and her shades drawn to block out light.[77] She states that beginning in 2011, she stopped going outside because of the noise

---

and ascertainable.") (quoting *Larthey by Larthey v. Bland,* 532 A.2d 456, 458 (Pa. Super. 1987)

[69] Russel Deposition (ECF No. 67-1) at 7; Russell Deposition (ECF No. 81-7) at 14 (explaining that her decision to move her bedroom location occurred "pretty quickly, within a month or so, when the activity started [in 2010]).

[70] Russell Deposition (ECF No. 81-7) at 22-23; *see also* Amended Complaint (ECF No. 34) at ¶ 36-38 (describing venting of Rexford well occurring as early as March 2011 and affecting Ms. Russell).

[71] Russell Deposition (ECF No. 81-7) at 22-23, 25.

[72] *Id*. at 8.

[73] *Id.* at 19-21.

[74] J. Splain Deposition (ECF No. 67-4) at 10 ("If you're talking about when they were doing the drilling, there was a constant droning sound that drove me absolutely insane, because I had been a musician, a bass player for a long time; so my brain is trained to analyze low frequency noise to figure out what I'm supposed to play on the bass. So this drilling thing kept me from sleeping, kept me from thinking straight.").

[75] *Id.*

[76] S. Splain Deposition (ECF No. 67-3) at 9-11.

[77] *Id.* at 11.

and dust produced by the operations.[78]  She began to purchase bottled water in June 2011 for drinking and cooking.[79]

- **Janelle Splain** stated that in 2010, she observed an increase in traffic and construction noise, including "clanking" and "banging."[80]  During this time, she was disturbed by noises and lights emanating from the well, leaving her "sleepless"[81] and nervous,[82] and she purchased room-darkening shades.[83]  She states during that time, she "did not go out generally as much" and she and her family would leave to go to New York "any chance [she] could."[84]

- **Susan Housel** states that in late 2010, she noticed dust, traffic, and noise.[85]  She describes the dust in November of 2011 as "bad."[86]  She states that she heard loud noises resembling that of "a plane flying over" beginning in late 2010 and continuing into 2011.[87]  When she moved into her home in November 2010 and continuing through 2011 and beyond, she would feel her eyes burning after she took a shower.[88]  She states that as early as 2011, she did not drink tap water and was using bottled water for drinking and cooking.[89]

- **John Chaffee** states that in 2010, the dust from Chesapeake's drilling got so bad that he met with his state representative and the Department of Environmental Protection to seek their intervention.[90]  During that time, lights emanating from the well shined right through his home, eventually forcing him to put up curtains on his windows,[91]

---

[78]  S. Splain Deposition (ECF No. 71-1) at 66.

[79]  *Id.* at 65.

[80]  Janelle Splain Deposition (ECF No. 73-8) at 2.

[81]  *Id.* at 2.

[82]  *Id.* at 4.

[83]  *Id.* at 3.

[84]  Janelle Splain Deposition (ECF No. 71-1) at 103.

[85]  S. Housel Deposition (ECF No. 67-7) at 3-4.

[86]  S. Housel Deposition (ECF No. 81-4) at 11.

[87]  S. Housel Deposition (ECF No. 67-7) at 3-4.

[88]  *Id.* at 3, 5.

[89]  *Id.* at 5.

[90]  J. Chaffee Deposition (ECF No. 67-6) at 5-7.

[91]  *Id.* at 8.

and he heard loud noises occurring twenty-four hours per day.[92]  He also complains of traffic during that time.[93]  He stopped drinking tap water in 2010 because of contamination fears and began to purchase five-gallon jugs delivered to their home every two weeks.[94]  After 2010, he began using his well water far less.[95]

- **Carol French** states that beginning in 2009, "the lights were in [her] bedroom window" for twenty-four hours a day, and she heard a "droning" noise that felt like it was coming up from underneath her home.[96]  She also complains of traffic that began at the end of 2010 and continued through the middle of 2013, and complains about the dust arising from that truck traffic.[97]  She states that the as a result of the traffic, dust would blow onto their corn and onto the clothes she had drying outside.[98]  During the spring of 2011, she heard noises associated with blasting rocks.[99]  In March of 2011, she noticed changes in her water quality.[100]  In July of 2011, she contacted the Pennsylvania Department of Environmental protection to complain that her water had become cloudy with gelatin-like viscosity.[101]

- **Claude Arnold** states that when the wells were drilled, he noticed a heavy uptick in traffic.[102]  He also states that during drilling, his water turned cloudy, murky, and it would fizz, and as a result, he doesn't

---

[92]  *Id.*

[93]  *Id.*

[94]  *Id.* at 11,

[95]  *Id.*

[96]  C. French Deposition (ECF No. 67-9) at 4-5.

[97]  C. French Deposition (ECF No. 81-3) at 6-7.

[98]  *Id.* at 7-8.

[99]  *Id.* at 11.

[100]  *Id.* at 15-16.

[101]  *Id.* at 14-16.

[102]  C. Arnold Deposition (ECF No. 71-1) at 134-35.

drink it anymore.[103]   He could hear flaring from a well whose operations ceased prior to 2010.[104]

- **Carolyn Knapp** states that the she was first affected by natural gas activity in 2010.[105]   Noise would plague her "all hours of the day and night."[106]   She states that in 2011, lights were on during all facets of the wells' operations.[107]   Those lights obstructed her view of the night sky, impairing an activity she previously enjoyed with her family.[108] She noticed changes in her water in March 2011.[109]

- **Alison Kolesar** complains of traffic, dust, and noise related to activities wells that were drilled in 2011 or before.[110]   She states that she recalls truck traffic between 2011 and 2012, that it was annoying to hear them drive by, and that it increased the dust on the road.[111] She describes the dust as "very" substantial and that it was not healthy for her horses, whose pasture abuts the road.[112]   She heard banging noises during the construction of a well.[113]   She said that when she first moved into her house in 2009, that her water had a sulfur smell, and that it was "bad."[114]   She states that her water turned cloudy

---

[103]   C. Arnold Deposition (ECF No. 81-1) at 8-9; *see also* Amended Complaint (ECF No. 34) at ¶ 64 (describing that the Arnolds noticed a change in their water quality in March 2011 immediately after the Scrivener wells were drilled).

[104]   C. Arnold Deposition (ECF No. 81-1) at 6.

[105]   C. Knapp Deposition (ECF No. 67-12) at 5.

[106]   *Id.* at 7.

[107]   *Id.* at 8-9.

[108]   *Id.*

[109]   Plaintiff's Statement of Facts (ECF No. 67) at ¶ 133; Defendant's Statement of Facts (ECF No. 72; *see also* C. Knapp Deposition (ECF No. 67-12) at 10-12.

[110]   *See* A. Kolesar Deposition (ECF No. 67-14) at 5-7; A. Kolesar Deposition (ECF No. 71-1) at 105-11; Defendant's Statement of Facts (ECF No. 67); Plaintiff's Response to Defendant's Statement of Facts (ECF No. 72).

[111]   *See* A. Kolesar Depo (ECF No. 81-6) at 9-10.

[112]   *Id.* at 10-11.

[113]   *Id.* at 5.

[114]   *See* A. Kolesar Depo (ECF No. 81-6) at 9-12; *see also* Amended Complaint (ECF No. 34) at ¶ 65 (describing that Ms. Kolesar noticed a change in her water quality in May 2011).

while the wells were being built or fracked, but that once activity ceased, her water quality improved.[115]

The invasions that Plaintiffs allege between 2009-2011 mirror the types of invasions that have formed the basis for actionable nuisance claims: disturbances produced by 24/7 lights that prevent sleep,[116] loud sounds rising to the level of a "jet engine,"[117] heavy dust,[118] alleged water contamination,[119] and heavy traffic in

---

[115] *Id.* at 12-13.

[116] *See Tiongco v. Southwestern Energy Production Company*, 214 F.Supp.3d 279, 291-92 (M.D.Pa. 2016) (explaining that plaintiff's deposition testimony contains "instances from which a reasonable juror could infer that [d]efendant knew or had substantial certainty that its conduct was invading [p]laintiff's use and enjoyment of her land" including plaintiff's testimony that "testified that construction lights were placed near her home on the side of her bedroom and ran twenty-four hours a day for approximately eight weeks" and those lights "prevented her from sleeping"); *Butts v. Southwestern Energy Production Co.*, No. 3:12 CV 1330, 2014 WL 3953155 (M.D.Pa. Aug. 12, 2014) (allowing plaintiffs' nuisance claims to survive summary judgment when they alleged defendant's drilling activities caused in part excessive noise and light disturbances).

[117] *Tiongco*, 214 F.Supp.3d at 283 (explaining that "sounds emanating from the nearby drilling site were so extreme that they would at times rise to the level of a 'jet engine'" could form basis for nuisance liability); *see also Kohr v. Weber*, 166 A.2d 871, 873 (Pa. 1960) (explaining that loud noises including "blowing of horns, roaring of engines, screeching of brakes, screaming of spectators, and shouting over the public address system, turn the atmosphere into a deafening whirlpool of sound" can constitute a nuisance).

[118] *See Harford Penn-Cann Service, Inc. v. Zymblosky*, 549 A.2d 208, 209 (Pa. Super. 1988) (affirming trial court's finding that dust from truck stop was severe enough to constitute nuisance). In *Harford*, the trial court enjoined operations at a defendant's gas station and truck stop after concluding its dust emissions constituted a nuisance as a matter of law. *Id.* at 208-09. On appeal, defendants asserted that "the trial court erred in its conclusion of law that [defendants] were liable for creating a continuing nuisance." *Id.* In affirming the trial court, the Pennsylvania Superior Court did not decide whether the dust invasion constituted a permanent or continuing nuisance; they simply concluded that sufficient evidence supported the trial court's factual findings and that the trial court did not err in finding dust constituted a nuisance as a matter of law. *Id.* Thus, in my view, *Harford* stands for the proposition that invasive dust can form the basis of a nuisance complaint. Aside from the court's characterization of the defendant's argument appeal, there is no language discussing whether dust invasions are continuing nuisances for limitations purposes, or whether that was even an issue in the case.

conjunction with noise and other invasions.[120]  The fact that Chesapeake received a citation in August 2011 for failing to protect groundwater sources objectively corroborates Plaintiffs' testimony that their harms first occurred between 2009-2011.[121]

Evidence demonstrating when Chesapeake's wells were drilled confirms Plaintiffs' averments that their harms occurred prior to 2011.  Parties agreed to limit discovery to five wells within one mile of Plaintiffs' property (or as Plaintiffs

---

[119] *Roth v. Cabot Oil & Gas Corp.*, 919 F.Supp.2d 476 (M.D.Pa. 2013) (denying the natural gas driller's motion to dismiss after generally determining that plaintiffs had alleged sufficient injuries, in addition to water contamination problems, that could cause "a seriously annoying or intolerable nuisance"); *Butts*, 2014 WL 3953155 (allowing plaintiffs' nuisance claims to survive summary judgment when they alleged defendant's drilling activities caused excessive noise and light disturbances and contaminated their water supply).  Pennsylvania courts have adopted § 821F of the Restatement (Second) of Torts, s*ee, e.g.*, *Kembel v. Schlegel*, 478 A.2d 11, 15 (Pa. Super. 1984).  Comment F of that section suggests that a community's shared fear of water contamination may be taken into account when determining whether harms amounted to a nuisance. *See* Restatement (Second) of Torts § 821F cmt. f ("*Normal mental reactions.* In determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact.").

[120] *See Bedminster Tp. v. Vargo Dragway, Inc.*, 253 A.2d 659, 661-62 (Pa. 1969) (explaining traffic in conjunction with loud, deafening noises and other disturbances could produce nuisance liability for drag strip racing track); *Anderson v. Guerrein Sky-Way Amusement Co.,* 29 A.2d 682, 683-85 (1943) (fifty-four plaintiffs brought action against drive-in theatre which operated with bright lights and loud noise inconsistent with the residential character of the neighborhood and prevented plaintiffs from sleeping).

[121] In 2010, the Department of Environmental Protection ("DEP") received a citizen complaint of "cloudy water in a private water supply" near Chesapeake's Rexford site. Chesapeake investigated and collected samples at this water supply in October 2010 and 2011, and found that methane, iron, and manganese levels had been elevated.  DEP cited Chesapeake with three violations: failure to prevent the migration of gas or other fluids into sources of fresh groundwater, unpermitted discharge of polluting substances, and venting of gas. *See* Letter (ECF 71-1) at 137-40.

state, focus their attention on the "especially egregious" wells),[122] and it is undisputed that those wells were drilled prior to 2011.[123]

Even if Plaintiffs maintain that every Chesapeake well listed in the complaint contributes to the nuisance, the record still shows Chesapeake's operation was likely drilled, in its totality and at the latest, in October 2011.[124] To the extent the drilling date of any wells remain disputed or unknown,[125] Plaintiffs

---

[122] Defendant's Brief in Support (ECF No. 68) at 9 (limiting discovery to Ammerman 2H, Rexford 2H, Rexford 5H, Hayward 2H and Hess 1); Plaintiffs' Brief in Opposition (ECF No. 71) at 4 n.1 (same).

[123] Uncontroverted evidence shows that Hess was drilled before 2009, *see* Amended Complaint (ECF No. 34) at ¶ 100; Answer (ECF No. 35) at 100, Rexford 2H was drilled in 2010, *see* Amended Complaint (ECF No. 34) at ¶ 32; Answer (ECF No. 35) at 32, Ammerman 2H was drilled prior to 2011, *see* Amended Complaint (ECF No. 34) at ¶ 86; Defendant's Supplemental Brief in Support of Motion for Summary Judgment (ECF No. 80) at 10. Chesapeake states that Rexford 5H and Hayward 2H were drilled prior to 2011; facts that Plaintiffs do not dispute. Defendant's Supplemental Brief (ECF No. 80) at 10.

[124] Uncontroverted evidence shows that Frisbee 2H and Frisbee 6H were drilled in 2010, *see* Amended Complaint (ECF No. 34) at ¶ 96-97; Answer (ECF No. 35) at 96-97, Covington 5H was drilled in January 2011, Amended Complaint (ECF No. 34) at ¶ 53; Answer (ECF No. 35) at 53, Scrivener N 4H and Scrivener S 1H were drilled in February 2011, Amended Complaint (ECF No. 34) at ¶ 62-63; Answer (ECF No. 35) at 62-63. Keir NW 5H was drilled in March 2011, *see* Amended Complaint (ECF No. 34) at ¶ 73; Answer (ECF No. 35) at 73.

Although Plaintiffs aver that Ammerman 3H was drilled in 2010, that Alderfer 2H and Alderfer 4H were drilled in January 2011, and that Lattimer 2H was drilled in October 2011, Chesapeake denied those averments in its answer. *See* Amended Complaint (ECF No. 34) at ¶ 86, 69, 91; Answer (ECF No. 35) at 86, 69, 91. Neither party has identified this dispute as material.

[125] The record does not show when Covington 2H, Covington 3H, Crain, Herr 3H, Herr Bra 2H, Keir NW 5H, Keir SW 5H, and Keir NE 1H were constructed or drilled. Defendants dispute the existence of Herr 2H. *See* Joint Case Management Plan (ECF No. 48) at 3 n.1.

point to no evidence suggesting that these facts are either disputed or material such that they change when Plaintiffs' cause of action accrued.[126]

Indeed, demonstrating that this action is timely is the Plaintiffs' burden to bear: under Pennsylvania law, once a defendant pleads the statute of limitations as a defense and has established that the action is untimely, the burden shifts to the plaintiff to point to facts "sufficient to remove the bar of the statute."[127] To survive summary judgment, then, Plaintiffs needed to "'designate[d] specific facts showing there is a genuine issue for trial.'"[128] Plaintiffs have not identified facts to

---

[126] *See Russo, et al. v. Cabot Corp., et al.*, No. CIV.A. 01-2613, 2002 WL 31163610, at *1 (E.D. Pa. May 24, 2002) (explaining that to survive summary judgment after defendant raises statute of limitations, plaintiffs must "come forth with evidence creating genuine issues of material fact in support of their position that their actions are not stale. Demonstrating the absence of facts as to timeliness is not enough.").

[127] *McPhilomy v. Lister,* 252, 19 A.2d 143, 144 (Pa. 1941); *Sternberg v. Tradesmen's Nat. Bank*, 81 Pa. Super. 199, 200 (1923) ("…the defendant having pleaded the statute of limitations, the burden was upon the plaintiff to produce evidence from which a jury could be permitted to find a promise within six years"); *see also Russo v. Cabot Corp.*, No. CIV.A. 01-2613, CIV.A. 01-2614, CIV.A. 01-2775, CIV.A. 01-2776, 2002 WL 31163610, at *1 (E.D.Pa. May 24, 2002) ("We start with the proposition that a plaintiff always has the burden to establish that an action is timely filed once the defendant raises the defense of the statute of limitations.").

[128] *See Osei–Afriyie v. Medical College of Pennsylvania*, 937 F.2d 876 (3d Cir.1991) (citing *McPhilomy,* 252, 19 A.2d at 144) (applying Pennsylvania law to determine that plaintiff had the burden to show action was timely). When the nonmoving party—here, the Plaintiffs— have the burden at trial, "summary judgment is appropriate if non-movants 'fail to make a showing sufficient to establish the existence of an element essential to [their] case.'" *In re TMI Litig. (Aldrich),* 89 F.3d 1106, 1116 (3d Cir.1996) (citing *Nebraska v. Wyoming,* 507 U.S. 584, 590 (1993). Thus, Plaintiffs must go beyond their papers and "'designate specific facts showing there is a genuine issue for trial'"—they must identify specific facts showing that their actions are timely. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)); *accord Dombroski v. Gould Electronics, Inc.*, 954 F.Supp. 1006, 1012 (M.D.Pa. 1996) (finding nuisance and trespass claim accrued as a matter of law  after noting that plaintiffs "failed to meet their burden of refuting [defendant's] contentions, having not submitted any

contravene the notion that the permanent nuisance was created at the time Chesapeake drilled its wells. And Plaintiffs concede that the discovery rule does not apply to toll the accrual date.[129]

Insofar as Plaintiffs argue that Chesapeake's disturbances were mere annoyances between 2009 and 2011 and did not amount to a legally actionable nuisance until after December 27, 2011, that argument fails for two reasons. First, nuisance liability is predicated on "significant harm" measured objectively—that is, harm "of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose."[130] What amounts to significant harm is not measured subjectively by a particular plaintiff.[131] If an

---

documents or affidavits which would tend to show this Court that there exists a genuine issue of material fact concerning the issue of the statute of limitations").

[129] Although Plaintiffs initially averred that discovery rule applied to toll their claims, *see* Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 71) at 7, both parties now agree that the discovery rule does not apply. *See* Plaintiffs' Supplemental Brief (ECF No. 81) at 16; Defendants' Supplemental Brief (ECF No. 80) at 11.

[130] *Kembel v. Schlegel*, 478 A.2d 11, 15 (Pa. Super. 1984) (quoting Restatement (Second) of Torts § 822F)).

[131] *See Umphred v. VP Auto Sales & Salvage, Inc.*, No. 1372 MDA 2014, 2015 WL 6965725, at *8 (Pa. Super. June 24, 2015) ("The standard for determining whether an alleged invasion is "significant" is the "standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant.") (citation omitted); *Kamuck v. Shell Energy Holdings GP, LLC*, 4:11–CV–1425, 2015 WL 1345235 (M.D.Pa. Mar. 25, 2015) (dismissing plaintiff's nuisance claim in part because after explaining that nuisance harm is measured objectively, plaintiff "presented nothing to support this private nuisance claim beyond his subjective upset at the volume of road traffic he has experienced periodically outside his home on a public thoroughfare").

individual plaintiff could revive an otherwise time-barred claim by arguing that that he or she did not feel personally or subjectively harmed until a later point in time, that would render the statute of limitations illusory.[132] Here, looking to Plaintiffs' deposition testimony in its totality, Plaintiffs allege similar harms, occurring during similar periods of time. In fact, some Plaintiffs discussed the harms they incurred with each other. These facts buttress the notion that Plaintiffs objectively incurred significant harm between 2009-2011.

Second, harms that Plaintiffs' suffered after December 27, 2011 may speak to the extent of the nuisance and to the extent of Plaintiffs' damages; but the statute of limitations does not wait for a plaintiff to realize the extent of his or her harm.[133] The limitations period begins when a plaintiff's injury first occurred. Here, there may be a dispute of fact as to when Plaintiffs' harms became the *most* deleterious, but that moment in time does not determine when the limitations period begins to tick.

---

[132] *Cf. Barren by Barren v. U.S.*, 839 F.2d 987, 992 (3d Cir. 1988) (rejecting argument that individual's subjective limitation could excuse untimely filing because permitting individual with mental disability to file a claim "later than an objectively reasonable person would be tantamount to ruling that a plaintiff's mental infirmity can extend the statute of limitations").

[133] *Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc*., 468 A.2d 468, 471 (Pa. 1983) ("lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations"); *Adamski v. Allstate Ins. Co*, 738 A.2d 1033, 1042 (Pa. Super. 1999) ("for purposes of the statute of limitations, a claim accrues when a plaintiff is harmed and not when the precise amount or extent of damages is determined").

For example, Susan Housel states that between 2010-2011, she heard loud noises resembling a "freight train" emanating from a well.[134]   In 2013, she describes an episode of loud venting that startled her and her daughter.[135]   The 2013 episode may have been the most harmful as to Ms. Housel, but that does not excuse the fact that she first possessed facts giving rise to her right to relief in 2010-2011.   In another example, Carol French states that beginning in March 2011, she noticed changes in her water quality, leading her to complain to the Pennsylvania Department of Environmental in July 2011.[136]   In 2012, she states as she was preparing to harvest her tomatoes, her garden turned moldy and black.[137]   The 2012 episode may have been the most harmful as to Ms. French, but that does not excuse the fact that she first possessed facts giving rise to her right to relief in 2011.   Harms occurring after December 27, 2011 do not excuse Plaintiffs from filing their action within two years from when their injuries first occurred.[138]

These subjective attestations are also insufficient to allow me to infer that Chesapeake actions after December 27, 2011 created a "new nuisance" that was

---

[134]   *See* S. Housel Deposition (ECF No. 81-4) at 5-6.

[135]   *Id.* at 7.

[136]   C. French Deposition (ECF No. 81-3) at 15-16.

[137]   *Id.* at 8-9.

[138]   *See Pocono Intern. Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983) (explaining that a plaintiff "is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period").

not time-barred. Without any Pennsylvania cases on point, I find helpful an opinion issued by the Texas Court of Appeals in *Graham v. Pirkey*. There, a homeowner in 1990 leveled his land to construct a pool, driveway, and drainage pipe.[139] The homeowner sold his land to the defendant.[140] The plaintiff, the defendant's neighbor, complained to the defendant that the prior homeowner's modifications caused water to flow onto her property that damaged her deck and eroded her backyard.[141] To remedy the problem, the defendant in 2002 removed a wall that diverted water into land surrounding the drainage pipe.[142] The plaintiff claimed that removing the wall created more damage, including destroying her front yard fence and other portions of her yard.[143] The court held that damages arising from the 1990 construction were time-barred because the diverting water constituted a permanent nuisance.[144] The court nevertheless held that damages stemming from the 2002 wall-removal were not time-barred at summary judgment because "there was a fact question as to whether [the defendant's] removal of the

---

[139] *Graham v. Pirkey*, 212 S.W.3d 507, 509-510 (Tex. App. 2006).

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.* at 511-12.

wall in 2002 substantially changed the original nuisance to such an extent that a new and distinct nuisance was created."[145]

Here, had the record contained evidence that a "new nuisance" was created within the limitations period, the statute of limitations calculus may have changed.[146] But the record contains no such evidence. There is no evidence that Chesapeake acted in a way to create a new and distinct nuisance after their wells were initially drilled. And aside from Plaintiffs' subjective attestations (which for reasons already discussed may not delay a cause of action from accruing), there is no objective evidence that Chesapeake's changed, worsened, or otherwise created a new nuisance that isn't time-barred.[147]

At most, Plaintiffs aver that one well which had been cited by the Pennsylvania Department of Environmental Protection ("DEP") in 2011 continued

---

[145] *Id.* at 512.

[146] At least one other jurisdiction has concluded that an "old nuisance does not excuse a new and different one," and if facts showed that Chesapeake committed a new tortious invasion, that new invasion may not be automatically time-barred as a result of this Court's present holding that Chesapeake's activities amount to a permanent change in the condition of the land. *See Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279-80 (Tex. 2004) (citing *Atlast Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681, 683 (Tex. 1975)) (holding that "limitations did not bar a suit for a temporary nuisance asserting an entirely new and different injury—damages caused by new emissions (acids required by new government regulations) to new property (sixty acres of cropland undamaged by previous pollution) due to new forces (extraordinary floods shortly before suit)").

[147] *Compare Town of Dish v. Atmos Energy Corporation*, 519 S.W.3d 605, 613 (Tex. 2017) (explaining that "subjective affidavit evidence" cannot defeat a limitations defense), *with Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150 (Tex. 2012) (finding nuisance claim timely-filed after limitations period had expired when objective evidence corroborated plaintiff's claim that nuisance conditions worsened).

to receive citations in 2014 for gas migration problems.[148]  Plaintiffs approvingly quote deposition testimony stating that "the problems in 2014 that led to the issuance of a [DEP citation] were the same problems addressed in a 2011 [DEP citation]."[149]  These citations show that the harms that first incurred in 2011 continued, or at least weren't remedied, through 2014; Plaintiffs' own characterization of these citations do not allow me to infer that well's problems changed or substantially worsened.[150]  And to the extent Plaintiffs argue that these ongoing citations should nevertheless reset the limitations period, Plaintiffs' argument fails because, as explained *supra*, Chesapeake's wells have permanently changed the condition of the land, and accordingly, Plaintiffs have but one action to recover for their past and future harms.[151]  In sum, the limitations clock begins ticking at the time the nuisance first occurred and does not reset for each subsequent invasion.[152]

Plaintiffs admit that "some activity" occurred outside of the limitations period; they suggest, however, and without citation to any authority, that the

---

[148]  Plaintiff's Supplemental Brief (ECF No. 83) at 2-3.

[149]  *Id.* at 2.

[150]  *Cf. Bumbarger v. Walker*, 164 A.2d 144, 148-49 (Pa. Super. 1960) (affirming jury's finding of trespass liability and on affirming finding of causation, stating: "Where conditions which have continued for a long period of time change coincidentally with the occurrence of a *new event*, which in common experience may have caused the change, there is sufficient evidence of causation present for the case to go to the jury") (emphasis added).

[151]  *Sustrik v. Jones & Laughlin Steel Corp.*, 197 A.2d 44, 46-47 (Pa. 1964).

[152]  *Id.*

limitation issue is better addressed by a motion in limine.[153]  While a motion in limine is appropriate to "narrow the evidentiary issues for trial" and "eliminate unnecessary trial interruptions," a summary judgment motion "is designed to eliminate a trial in cases where there are no genuine issues of fact."[154]  As discussed previously, Plaintiffs have not "come forth with evidence creating genuine issues of material fact in support of their position that their actions are not stale.  Demonstrating the absence of facts as to timeliness is not enough."[155]

Even if disputed factual issues prevented me from granting summary judgment on limitations grounds, a motion in limine may not be the appropriate vehicle through which to define the applicable limitations period.  As this Court has previously stated, the statute of limitations is "a procedural safeguard which protects parties from the vagaries of endless litigation of past alleged wrongs by requiring plaintiffs to bring their claims in a timely fashion.  Thus, at bottom, the statute of limitations is a defense…, not a rule of evidence."[156]

In conclusion, Plaintiffs point to no evidence that, at a minimum, creates a genuine issue of material fact sufficient to remove the bar of the statute of

---

[153]  Plaintiff's Reply to Defendant's Supplemental Brief (ECF No. 83) at 4.

[154]  *Bradley v. Pittsburgh Bd., of Educ.,* 913 F.2d 1064, 1069 (3d Cir. 1990).

[155]  *Russo, et al. v. Cabot Corp., et al.*, No. CIV.A. 01-2613, 2002 WL 31163610, at *1 (E.D. Pa. May 24, 2002).

[156]  *Univac Dental Co. v. Dentsply Intern., Inc*., 268 F.R.D. 190, 199 (M.D.Pa. 2010).

limitations.[157]  Plaintiffs themselves establish that the alleged invasions have been regular and ongoing beyond the two-year period preceding the filing of this action. Whether Chesapeake's actions amounted to a nuisance as a matter of law is an issue I do not decide; my focus is on the timeliness of Plaintiffs' nuisance claim. Although sympathetic to Plaintiffs' exhaustive and individualized descriptions of their plight, this record forces me to conclude that, because Plaintiffs filed the present action more than two years after their claims accrued, Plaintiffs' nuisance action is barred by the statute of limitations.

---

[157] *McPhilomy v. Lister,* 252, 19 A.2d 143, 144 (Pa. 1941); *see Crouse v. Cyclops Industries,* 745 A.2d 606, 611 (2000) (explaining that courts usually determine when statute of limitations commenced as a matter of law); *accord Cassel-Hess v. Hoffer*, 44 A.3d 80, 86 (Pa. Super. 2012) (affirming trial court dismissal of nuisance claim at summary judgment because statute of limitations had expired); *Sternberg v. Tradesmen's Nat. Bank*, 81 Pa. Super. 199, 200 (1923) ("…the defendant having pleaded the statute of limitations, the burden was upon the plaintiff to produce evidence from which a jury could be permitted to find a promise within six years"); *Russo v. Cabot Corp.*, No. CIV.A. 01-2613, CIV.A. 01-2614, CIV.A. 01-2775, CIV.A. 01-2776, 2002 WL 31163610, at *1 (E.D.Pa. May 24, 2002) ("We start with the proposition that a plaintiff always has the burden to establish that an action is timely filed once the defendant raises the defense of the statute of limitations.").

## III. CONCLUSION

For the foregoing reasons, Chesapeake's Motion for Summary Judgment will be granted.[158]  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[158] I decline to address Chesapeake's remaining arguments because summary judgment in Chesapeake's favor renders them moot.